**Donald L. JACKSON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 01–CM–1499.**

District of Columbia Court of Appeals.

Argued May 18, 2004.

Decided Aug. 5, 2004.

---

1112

Carl E. Snead, appointed by the court, for appellant.

Robert J. Feitel, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., Ian P. Alberg and Kathryn H. Ruemmler, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and NEBEKER, Senior Judge.

STEADMAN, Associate Judge:

Appellant and his co-defendant were selling music compact discs ("CDs") from a table they had set up on the sidewalk near Union Station. The CDs were "counterfeit"; that is, they were manufactured without the authorization of the copyright owner. Appellant was convicted at a bench trial of attempted deceptive labeling of a sound recording, in violation of D.C.Code §§ 22–103 (attempt) and –3814.1 (deceptive labeling) (1996).[1]

The only issue on appeal is whether the trial court erred in admitting, in the government's case in chief, evidence of prior criminal conduct in violation of the strictures of the case law emanating from *Drew v. United States,* 118 U.S.App. D.C. 11, 331 F.2d 85 (1964).[2] Specifically, evidence was introduced that five weeks prior to the date of the offense for which he was on trial, appellant had been arrested, also in the vicinity of Union Station, when he was also vending counterfeit CDs and was warned at that time that he was selling counterfeit CDs. (The actual arrest in that prior case was for vending without a license.) The government takes the position that the evidence went to the issue of appellant's knowledge that the CDs were counterfeit at the time of the offense for which he was on trial. Appellant argues that his knowledge was not then a materially contested issue, and his defense, in fact, was that he was not selling the CDs at all but rather just happened to be passing by at the time. The introduction of the evidence, he asserts, thus violated the prohibition that he reads into *Thompson v. United States,* 546 A.2d 414 (D.C.1988), against the introduction of *Drew* evidence which bore only upon issues not genuinely in dispute. We conclude that this is far too broad a reading of *Thompson* and affirm the conviction.

**I.**

The principal government witness in its case in chief was Officer Tracey Hanbury. He testified that he saw two men selling compact discs from a table they had set up on the sidewalk near Union Station. He saw both men sell CDs to customers. When he confronted the two individuals, he realized they were the same two men whom he had arrested some five weeks previously after witnessing them selling CDs outside Union Station. Although the prior arrest was for vending without a

---

1. These sections have been recodified as §§ 22–1803 and –3214.01 (2001).

2. Such *Drew* evidence is sometimes more broadly referred to as "bad acts" evidence, since it has been extended to bad acts "minimally in the nature of a criminal offense." *Freeman v. United States,* 689 A.2d 575, 580 n. 8 (D.C.1997) (citations omitted). For convenience, we will use the phrase "other crimes evidence" in this opinion to refer to all prior "bad acts" subject to *Drew.*

license, Officer Hanbury had advised appellant that the CDs he was selling were counterfeit.

Officer Hanbury further testified that the CDs he observed in appellant's possession at the time of the second arrest were "obviously counterfeits." He noted: "The front of the CD [was] just a thin piece of paper . . . that was copied on the CD and .. was cut with a pair of scissors where some of them don't have perfectly straight lines. . . They were also wrapped in saran wrap type wrapping and that wasn't consistent with what you would see in a music CD store."

The government presented an expert witness, Phillip Brooks, who testified that counterfeit CDs often have "poor shrink wrappings . . . poorly folded corners . . . while a legitimate compact disc is characterized by tight corners, [and] tight[ly] sealed." He further explained that "the insert card on a counterfeit disc will be a thin piece of paper . . . of poor quality," while the insert cards on a legitimate compact disc "are one of the more expensive aspects of the disc." He also said that the playing side of a counterfeit compact disc "will be greenish or bluish in tint which indicates it's a CD recordable," while "the legitimate compact disc will be silver and . . . legitimate record companies do not manufacture their compact disc on CD recordables." Mr. Brooks identified as counterfeits a random selection of discs from the box of 62 CDs seized from appellant.

Testifying in his own defense, appellant said he had come to Union Station for a dinner and movie with his common-law wife. After he parked his car and was walking toward the entrance, a police car came speeding towards him, two officers jumped out and escorted appellant over to the co-defendant and placed them under arrest. Appellant testified he was not selling any CDs and didn't receive any money from any customers. Appellant stated that he had never sold CDs in the District, but had other people sell CDs for him. Appellant acknowledged that he had been previously arrested and was then informed that the CDs being sold at his vending table were counterfeit but he said that at the time he had no idea that they were counterfeit. Once he found this out, he stopped carrying CDs at his vending table. Appellant's co-defendant testified that all of the property on the table belonged to him and that he had not given appellant any money that evening and, in fact, the co-defendant had not made a single sale all evening.

In rebuttal, the government called Officer Aisha Jackson, who testified that on several previous occasions she had "shut down" appellant for selling CDs without a vending license in the vicinity of Union Station.[3] She accompanied Officer Hanbury at the time of the prior arrest when the warning was given to appellant that the CDs that he was selling were counterfeit. On that occasion, appellant acknowledged that the CDs were his and stated, "Yeah, these are mine, everybody is doing it."

## II.

 "If evidence of prior bad acts that are criminal in nature and independent of the crime charged is offered to prove predisposition to commit the charged crime, it is inadmissible. . . . 'It is a principle of long standing in our law that evidence of one crime is inadmissible to prove disposition to commit crime, from which the jury may infer that the defendant committed the crime charged. Since

---

3. Appellant objected to Officer Jackson's testimony. The trial court permitted the examination as relevant to appellant's credibility in testifying that he had never, personally, sold CDs in the District. Appellant does not contest this ruling on appeal.

the likelihood that juries will make such an improper inference is high, courts presume prejudice and exclude evidence of other crimes unless that evidence can be admitted for some substantial, legitimate purpose.'" *Johnson v. United States,* 683 A.2d 1087, 1092 (D.C.1996) (en banc) (quoting *Drew, supra,* 331 F.2d at 89–90) (other citations omitted), *cert. denied,* 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997). This presumption of prejudice may be overcome if "the [other crimes] evidence [is] offered for a substantial, legitimate purpose,"[4] and "the court... consider[s] the relative probative value of the evidence and the danger of unfair prejudice that it poses, and conclude[s] that the balance favors admission." *Id.* at 1092–93 (citations omitted). Moreover, *Drew* does not apply at all where "such evidence (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context."[5] *Id.* at 1098.

The government first contends that *Drew* is inapplicable to the disputed evidence because the circumstances surrounding appellant's prior arrest provided "direct and substantial proof" of a constituent element of the crime charged, by demonstrating his knowledge of the counterfeit nature of the CDs at issue. The government's argument, that a factor in a previous crime which tends to make more probable an element of the current crime charged is therefore direct and substantial

proof of the current crime charged, if too broadly read could threaten to swallow up the very protection that *Drew* endeavors to provide. *Drew* places upon other crime evidence a presumption of prejudice not because such evidence is "irrelevant; on the contrary, it is said to weigh too much with the jury and to ... overpersuade them ...." *Thompson, supra,* 546 A.2d at 418 (quoting *Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948)). The difficulty is that *Drew* evidence often itself operates as "direct and substantial proof" of an element of a charged crime, such as with, for example, the intent and identity exceptions. It is no easy task to articulate the line that divides evidence subject to *Drew* from evidence not subject to *Drew* on the ground that the latter is "direct and substantial proof" of the offense.

A substantial portion of our cases declaring other crimes evidence to be "direct and substantial proof" of the crime charged involve the admission of evidence of prior possession of a weapon, which was also used in the charged crime. *See, e.g., Sanders v. United States,* 809 A.2d 584, 590 (D.C.2002), *cert. denied,* 538 U.S. 937, 123 S.Ct. 1602, 155 L.Ed.2d 340 (2003); *Busey v. United States,* 747 A.2d 1153, 1165 (D.C.2000); *Bright v. United States,* 698 A.2d 450, 455 (D.C.1997). We have held such determinations to be "consistent with the principle that '[a]n accused person's prior possession of the physical means of committing the crime is some

---

**4.** We have said that such substantial and legitimate purpose for the admission of other crimes evidence may include but is "not limited to, one of the following issues: (1) motive; (2) intent; (3) absence of mistake or accident; (4) common scheme or plan; or (5) identity." *Johnson, supra,* 683 A.2d at 1092.

**5.** The only real difference between other crimes evidence subject to *Drew* and evidence that falls into one of the categories to which

*Drew* does not apply is the standard and manner under which the evidence must be preliminarily established. To admit the former, the proponent must demonstrate to the trial court that the defendant committed the other crime by clear and convincing evidence. *See Johnson, supra,* 683 A.2d at 1101. Whether *Drew* or not, such evidence, like all other evidence, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice it poses." *Id.*

evidence of the probability of his guilt, and is therefore admissible." ' *Johnson, supra,* 683 A.2d at 1097 (quoting *Coleman v. United States,* 379 A.2d 710, 712 (D.C. 1977)). Other crimes evidence has also fallen outside the strictures of *Drew* in cases involving a shared "evidentiary stream" between the prior and the charged crime, *Johnson, supra,* 683 A.2d at 1098, and involving evidence of an attempt to conceal the charged crime. *Burgess v. United States,* 786 A.2d 561, 569 (D.C.2001), *cert. denied sub nom. Waddell v. United States,* 537 U.S. 854, 123 S.Ct. 210, 154 L.Ed.2d 88 (2002). *Compare Sweet v. United States,* 756 A.2d 366, 373–74 (D.C.2000).[6] We need not, here, explore the issue further because, even if we assume the disputed evidence does fall within the purview of *Drew,* its admission was not error.

### III.

■ The government argues, and we agree, that applying *Drew,* the evidence in question was properly admitted to prove appellant's knowledge that the CDs were counterfeit.[7]

■ We have not previously expressly recognized "knowledge" as a legitimate purpose for which other crimes evidence may be offered and, thereby, escape *Drew's* prohibition. In *Johnson,* we enumerated substantial and legitimate purposes warranting admission of other crimes evidence, which "includ[ed], but [were] *not limited* to ... (1) motive; (2) intent; (3) absence of mistake or accident; (4) common scheme or plan; [and] (5) identity." *Johnson, supra,* 683 A.2d at 1092 (emphasis added). Furthermore, we have identified as "consistent with District of Columbia law" the following language from Federal Rule of Evidence 404(b): "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, *knowledge,* identity, or absence of mistake or accident." *Id.* at 1100 n. 17 (emphasis added). Knowledge is widely accepted as a non-propensity purpose for which other crimes evidence may be admitted. *See generally, e.g.,* 29 AM. JUR. 2D. Evidence § 443 (1994); EDWARD J. IMWINKELREID, UNCHARGED MISCONDUCT EVIDENCE §§ 5:24, 5:26 (2004); Randall, *Acquittals in Jeopardy: Criminal Collateral Estoppel and the Use of Acquitted Act Evidence,* 14 U. Pa. L.Rev. 283, 307 n. 114 (1992) (citing RICHARD O. LEMPERT & STEPHEN A. SALTZBURG, A MODERN APPROACH TO EVIDENCE 215–16 (2d ed.1982)). Thus, we now explicitly hold that other crimes or bad acts evidence

---

**6.** The difficulty of determining whether other crimes evidence is one of the three types of evidence that is not subject to the strictures of *Drew* as set forth in *Johnson* (another example is determining whether evidence fell within the so-called *Toliver* exception, *Toliver v. United States,* 468 A.2d 958, 960–61 (D.C.1983)) lends some force to the suggestion that by some appropriate means, the jurisprudence of the District might align itself with that of the federal courts in applying FED. R. EVID. 404(b) to all such situations and relying on the probative versus substantial prejudice balancing process to deal with the *Drew* concerns. *See Daniels v. United States,* 613 A.2d 342, 349 (D.C.1992) (Schwelb, J., concurring); *Johnson, supra,* 683 A.2d at 1105–07 (King, J., concurring).

**7.** Knowledge and intent are not the same. "[K]nowledge is information as to a fact. The act of knowing; clear perception of the truth; firm belief; information. While both intent and knowledge are recordations in the mental processes, intent is the design, resolve, or determination with which a person acts." *Witters v. United States,* 70 App.D.C. 316, 106 F.2d 837, 840 (1939) (citation omitted); *see also* 29 AM. JUR. 2D *Evidence* § 443 (1994).

may be offered for the purpose of demonstrating "knowledge" and, absent a finding that the prejudicial effect of the evidence substantially outweighs its probative value, evidence offered for such purpose will overcome *Drew's* presumption of inadmissibility.

■ Given our adoption of this further exception to *Drew,* we must evaluate whether the evidence of appellant's previous arrest for the purpose of showing his knowledge was properly admitted. "A decision on the admissibility of evidence, of course, is committed to the sound discretion of the trial court." *Sanders, supra,* 809 A.2d at 590 (citation omitted). Moreover, "the evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision." *Johnson, supra,* 683 A.2d at 1095.

Appellant was convicted of attempted deceptive labeling. "A person commits the offense of deceptive labeling if, for commercial advantage or private financial gain, that person *knowingly* advertises, offers for sale, resale, or rental, or sells, resells, rents, distributes, or transports, or possesses for such purposes, a sound recording or audiovisual work, the label, cover, or jacket of which does not clearly and conspicuously disclose the true name and address of the manufacturer thereof." D.C.Code § 22–3814.1(b) (emphasis added). Thus, to secure a conviction for deceptive labeling, the government was required to prove that appellant knew that "the label, cover, or jacket of [the CDs in question] . . . [did] not clearly and conspicuously disclose the true name and address of the manufacturer thereof." Such knowledge would be implicit if appellant knew the CDs were counterfeit, and therefore could not reflect the true name of the manufacturer. Testimony that appellant had been previously warned that the CDs

he was selling were counterfeit went to the issue of whether he knew the CDs at issue were counterfeit. Although the government presented no direct evidence that the appearance of the CDs at issue was the same as the CDs about which appellant was warned, a fair inference to that effect could be made from the expert's general description of counterfeit CDs and the testimony of Officer Hanbury, the same individual who had previously warned the appellant about counterfeit CDs, that he immediately recognized that the CDs at issue were counterfeit. Thus, the trial court did not abuse its discretion in admitting evidence that appellant had previously sold counterfeit CDs because the evidence was not admitted to establish appellant's criminal propensity but to demonstrate appellant's knowledge as to the counterfeit nature of the discs, an essential element of the crime charged.

■ Appellant contends the trial court did "not make any independent inquiry separate from the initial *Drew* determinations to allow it to conclude that the probative value would outweigh the prejudicial impact on the defendant." First, appellant misstates the standard. The question is whether the "probative value [of the evidence] is substantially outweighed by the danger of unfair prejudice it poses." *Johnson, supra,* 683 A.2d at 1101. Second, appellant did not argue to the trial court that the evidence's probative value was substantially outweighed by its prejudicial effect. *See, e.g., Jones v. United States,* 548 A.2d 35, 47 (D.C.1988) (failure to object on prejudice grounds rendered conviction reversible only if error was plain). Third, and in any event, the trial court did rule that because the case was "a nonjury trial . . . the issues relating to the other crimes evidence are less problematic in terms of the potential prejudice." Such a determination was "quintessentially a

discretionary function" of which we find no abuse. *Johnson, supra,* 683 A.2d at 1095. Finally, appellant's claim that the trial court's subsequent statements reveal it improperly relied on this evidence to convict the appellant is without merit. The trial court referred to appellant's previous sales of similar CDs with his co-defendant in evaluating the existence of appellant's knowledge and the credibility of appellant's testimony, not in determining whether appellant had any criminal propensity.

### IV.

Appellant's most cogent argument is that *Thompson, supra,* 546 A.2d 414, precluded the admission of the evidence. Appellant contends that where the element of knowledge was not "contested in a meaningful way," the trial court could not permit the admission, in the government's case in chief, of other crimes evidence to demonstrate that element. In *Thompson,* this court held that "where *intent* is not controverted in any meaningful sense, evidence of other crimes to prove intent is so prejudicial per se that it is inadmissible as a matter of law.... Specifically, in the absence of exceptional circumstances, the government may not be permitted to introduce other crimes evidence in its case in chief to prove *intent ....*" 546 A.2d at 423–24 (emphasis added and footnote omitted); *see also Murphy v. United States,* 572 A.2d 435, 438 (D.C.1990).[8]

Despite appellant's assertion, *Thompson's* holding only addressed other crimes evidence offered to demonstrate intent and has not since been unequivocally extended to apply to other *Drew* exceptions.[9] The rule announced in *Thompson* stemmed from the prejudicial danger inherent in the

**8.** In *Murphy,* this court held that although the appellant informed the court that his defense would depend on the admissibility of the other crimes evidence, the sole fact that "the government was required to prove [the defendant's] specific intent to distribute as an element of the offense charged... cannot support the admission of other-crimes evidence ... [A] defendant must do something which controverts the alleged specific intent in some meaningful way before the prosecution may introduce *Drew* evidence on the issue of *intent.*" 572 A.2d at 438 (emphasis added).

**9.** Three of our cases arguably address this issue of whether *Thompson* applies to other *Drew* exceptions, none of which analyze the question in any depth. Two state, in dictum, that other crimes evidence must be directed to a contested issue. *See Howard v. United States,* 663 A.2d 524, 528 n. 6 (D.C.1995) (affirming the use of appellant's prior sex crimes to show his state of mind); *Roper v. United States,* 564 A.2d 726, 731 (D.C.1989) (reversing appellant's conviction for possession of a weapon; improper joinder of armed robbery charge was not harmless because the jury's acquittal of the appellant on the armed robbery charge precluded the government from demonstrating, by clear and convincing evidence, that appellant had committed the robbery, in accordance with *Drew* and its

progeny). The third case had an alternate ground for its holding. In *Wright v. United States,* 570 A.2d 731 (D.C.1990), the trial court let in evidence of a prior burglary where appellant's thumb print had been found on a piece of broken display glass accessible to the public. The trial court admitted the evidence to show intent, motive and identity. We ruled that it was admissible only for identity, since there was no dispute that whoever broke into the store in the second burglary wanted to steal the merchandise, citing *Thompson.* However, we further noted the serious question whether on any theory, the weakness of the probative value would be outweighed by the potential prejudice. *Cf., e.g., Hazel v. United States,* 599 A.2d 38, 41–42 (D.C.1991), *cert. denied,* 506 U.S. 939, 113 S.Ct. 374, 121 L.Ed.2d 286 (1992), *and Green v. United States,* 580 A.2d 1325, 1328 (D.C. 1990) (addressing an argument under *Thompson* and admitting other crimes evidence of motive to demonstrate identity, which was contested); *Gaither v. United States,* 759 A.2d 655, 661 (D.C.2000) (refusing to reach question of whether *Thompson* extended to all "state of mind rubrics, such as premeditation or malice" because any assumed error was harmless).

intent exception to *Drew* and not in other crimes evidence as a whole. We noted that "the *intent* exception has the capacity to emasculate the other crimes rule. This is so because, in many cases, it is difficult or impossible to differentiate between the intent to do an act and the predisposition to do it." [10] *Thompson, supra,* 546 A.2d at 420 (emphasis added; citation omitted). In *Thompson,* we determined "intent piggy-back[ed] on predisposition" where the previous crime and the charged crime were only connected by an assumption that because the defendant was formerly predisposed to sell drugs, he remained so. *Id.* at 427. We recognized the danger that evidence of prior crimes "become[s] probative with respect to intent only after an inference of predisposition has been drawn . . . [and] the distinction between intent and predisposition then becomes ephemeral." *Id.* at 421. The *Drew* exception of knowledge does not present the same concerns. This is because "knowledge is information as to a fact . . . [w]hile . . . intent . . . is the design, resolve, or determination with which a person acts." *Witters, supra* note 7, 106 F.2d at 840. With respect to knowledge, "[t]he existence of the other act results in some sort of warning or knowledge which leads to knowledge in the case under consideration." 29 AM. JUR. 2D *Evidence* § 443. Accordingly, we conclude that *Thompson* only applies to other crimes evidence proffered to establish intent and does not extend to encompass any other *Drew* exception, including knowledge.

The dilemma that is presented by too broad an application of *Thompson* is demonstrated in the case before us. It was incumbent upon the government to prove knowledge of the counterfeit nature of the CDs in its case in chief. Without evidence of the warning to appellant at the time of the prior arrest, a successful motion at the close of the government's case in chief for judgment of acquittal for insufficient proof of that point was a clear threat, since otherwise such an inference would depend solely upon the appearance of the CDs. The trial court itself made this precise observation.[11] There was no stipulation by the appellant to the fact of knowledge, in the event that his defense of innocent presence was rejected. It would seem in such a situation, even where the *Drew* evidence relates to intent, the trial court could well demand such an express stipulation as a condition of exclusion of such evidence in the government's case in chief.

## V.

The trial court did not err in permitting, in the government's case in chief, the introduction of other crime evidence for the purpose of demonstrating appellant's knowledge of the counterfeit nature of the CDs, even where he had not at that time disputed, nor did he later dispute, that issue. Accordingly, the judgment appealed from is hereby

*Affirmed.*

---

10. *Thompson* also recognized that "[i]ntent is an element of virtually every crime. If the 'intent exception' warranted admission of evidence of a similar crime simply to prove the intent element of the offense on trial, the exception would swallow the rule." 546 A.2d at 421.

11. While the testimony of Officer Hanbury was that the CDs were "obviously" counterfeit, the trial court commented that, "[i]f the two of you [defendants] had not been previously warned, I might not have even been able to find you guilty based on the evidence if this was the first time you were ever caught selling these fake CDs."