# District of Columbia
# Court of Appeals

No. 13-CF-0588

EDWARD DAMIAN ALLEN,

                                        Appellant,



F I L E D

APR **21** 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

    v.                                                      CF2-13174-11


UNITED STATES,

                                        Appellee.


On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE:  BECKWITH and EASTERLY, *Associate Judges*; and BELSON, *Senior Judge*.


# J U D G M E N T

This case was submitted to the court on the transcript of record and the briefs filed, and without presentation of oral argument. On consideration whereof, and for the reasons set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment of the trial court is affirmed.

                                        For the Court:


                                        *Julio A. Castillo*

                                        JULIO A. CASTILLO
                                        Clerk of the Court


Dated: April 21, 2016.

Opinion by Senior Judge James A. Belson.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-0588

EDWARD DAMIAN ALLEN, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-13174-11)

(Hon. Michael Ryan, Trial Judge)

(Submitted September 15, 2015              Decided April 21, 2016)

*Fletcher P. Thompson* for appellant.

*Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, with whom *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Patricia A. Heffernan*, Assistant United States Attorneys, were on the brief for appellee.

Before BECKWITH and EASTERLY, *Associate Judges*, and BELSON, *Senior Judge*.

BELSON, *Senior Judge*:  Following a jury trial, appellant Allen was convicted

of two counts[1] of felony deceptive labeling in violation of D.C. Code § 22-3214.01

---

[1]  The first count of the indictment alleged, "[o]n or about July 12, 2011 . . . Edward Allen . . . advertised, offered for sale, resale, and rent; and sold, resold, rented, distributed and transported; and possessed for such purposes, one thousand

(continued . . .)

(b) (2012 Repl.).[2]  On appeal, appellant contends that the government failed to prove that he knowingly engaged in deceptive labeling.  The government asks that we summarily affirm the judgments below.  We have not, however, had occasion yet to consider or define the term "knowingly" within the context of this statute.  Accordingly, we deny the government's motion, and take this opportunity to analyze the sufficiency of the government's evidence as it relates to whether appellant "knowingly" offered audio and visual recordings for sale that were deceptively labeled within the meaning of D.C. Code § 22-3214.01.  Finding sufficient evidence of appellant's knowledge in the record, we affirm.

_____

(. . . continued)

or more sound recordings, for commercial advantage and private financial gain, while knowing that the label, cover, or jacket of the sound recordings did not clearly and conspicuously disclose the true name and address of the manufacturer thereof."

The second count alleged, "[o]n or about July 12, 2011 . . . Edward Allen . . . advertised, offered for sale, resale, and rent; and sold, resold, rented, distributed and transported; and possessed for such purposes, one hundred or more audiovisual works, for commercial advantage and private financial gain, while knowing that the label, cover, and jacket of the audiovisual works did not clearly and conspicuously disclose the true name and address of the manufacturer thereof."

[2]  D.C. Code § 22-3214.01 (b) provides, "[a] person commits the offense of deceptive labeling if, for commercial advantage or private financial gain, that person knowingly advertises, offers for sale, resale, or rental, or sells, resells, rents, distributes, or transports, or possesses for such purposes, a sound recording or audiovisual work, the label, cover, or jacket of which does not clearly and conspicuously disclose the true name and address of the manufacturer thereof."

**I.**

Appellant was the manager of "American Shottas," a store that sold compact discs (CDs), digital video discs (DVDs),[3] baseball hats, apparel, shoes, and other items, such as purses. On July 12, 2011, the Metropolitan Police Department (MPD) executed a search warrant at American Shottas. Appellant was present during the warrant's execution, which revealed that the store's office contained a computer, a CD burner device, and numerous blank CDs and DVDs. During a videotaped interview, appellant admitted he was the day-to-day manager of the store, and had worked there "on and off" for more than two years. He said that his normal duties included helping customers, ordering CDs, and using the store's electronics to "mix tapes."

At trial, the government offered the expert testimony of Michael Middleton, an investigative consultant for the Recording Industry Association of America, who works regularly with law enforcement to identify counterfeit CDs and DVDs, and illegally sold content. He explained the difference between "burning" and "pressing" CDs and DVDs, and testified that the majority of legitimately produced CDs and DVDs are pressed due to the comparative speed of that process.

---

[3] The term digital video disc, recordable (DVDR) is also used *infra*.

According to Mr. Middleton, 90% of counterfeit CDs and DVDs are burned, rather than pressed.

Mr. Middleton also testified that counterfeit CDs can be sold in a variety of packaging. For example, he testified that counterfeit CDs are often sold without printed artwork, or simply with writing from a magic marker. He testified that it is very rare for counterfeit CDs to display anything resembling industry quality artwork, and often they are marketed unwrapped or in non-standard packaging. Mr. Middleton further testified about pricing as an indicator of counterfeit products. While legitimately produced CDs are normally priced from $14 to $20, counterfeit CDs will usually cost "[a]s little as $2 a piece. Sometimes they're— they're up to $10."

Mr. Middleton testified that he "didn't participate in the execution of the search warrant[,]" and that he "came in afterwards." Incident to the search, he examined 15,984 CDs. He testified that the search revealed "spindles" of freshly burned discs that were awaiting packaging into slim-line jewel cases. He also testified that none of the CDs or DVDs were individually priced. Rather, he noted, CDs were generally advertised as costing $10 apiece, or $25 for a set of three, while DVDs were priced at $15 apiece, or $25 for a set of two. Also, the packaged

discs did not contain liner notes, which are usually intended to give the consumer information about the manufacturer.

The MPD also seized 2,836 DVDs.  On a random sampling of DVDs seized at American Shottas, Mr. Middleton found that they failed to set forth the manufacturer's name and address, or identified the wrong manufacturer or record label (in the case of music DVDs), that some were recordable DVDs—something a major studio, like Paramount, would never do—that they were imprecisely packaged, had illegible or no labeling, or had labeling made on copier-quality paper—also not common for the recording industry—and that, with respect to music DVDs, the labeling displayed artists who had not appeared together, or who do not sanction their likeness on DVDRs.

Based on his training and experience, and his observations at American Shottas, Mr. Middleton concluded, except with respect to approximately 100 CDs, "[t]hat every disc we seized was illegal."  He also testified that the types of discs seized at American Shottas are typically sold at stores that market counterfeit or illegal merchandise.

During its closing argument, the government urged the jury to find that appellant knowingly engaged in deceptive labeling based on his role as manager,

and on the fact that he had worked at American Shottas for at least two years before the store was raided on July 12, 2011. "[I]f you've been surrounded by these counterfeit items . . . you're going to pick up on . . . what kind of merchandise is being sold . . . . Especially if you're the manager . . . and . . . it's your job to know what's being sold . . . . It would be impossible for you not to be familiar with [the merchandise] because you worked there for two years."

Following closing arguments, the trial judge instructed the jurors on the applicable law. He told the jurors they could make "reasonable inferences [that are] justified in light of your experiences." He instructed them that they were "permitted to give equal weight" to circumstantial and direct evidence, and that they were entitled to consider opinions of expert witnesses, like Mr. Middleton. He also instructed them that knowledge was an element of deceptive labeling under D.C. Code § 22-3214.01 and that they were entitled to consider whether appellant "knowingly" engaged in the offense based on the surrounding circumstances. "[S]omeone's intent or knowledge ordinarily cannot be proven directly. . . . You may consider any statement made or acts done by . . . Edward Allen . . . and all other facts and circumstances received in evidence which indicate [his] intent and knowledge."

## II.

On appeal, we review the evidence supporting a conviction in the light most favorable to the government and in accordance with the principle that where, as here, a case is tried before a jury, it is the prerogative of the jury to weigh and assess the credibility of the evidence and draw reasonable inferences from it. *West v. United States*, 100 A.3d 1076, 1090 (D.C. 2014); *see also* D.C. Code § 17-305 (a) (2012 Repl.) ("When issues of fact were tried by jury, the court shall review the case only as to matters of law."). We will not reverse a conviction for insufficiency of the evidence unless the appellant demonstrates "that the prosecution offered no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt." *West*, *supra*, 100 A.3d at 1090 (quoting *Olafisoye v. United States*, 857 A.2d 1078, 1086 (D.C. 2004)).

Appellant challenges the sufficiency of the evidence supporting the jury's finding that he knowingly engaged in deceptive labeling.[4] This court has not yet had the opportunity to address an appellant's challenge to the sufficiency of the

---

[4] Appellant's brief states that the "Question Presented" is: "[w]as the evidence presented by the government sufficient to establish that appellant knew that the items in the store were deceptively labeled?"

evidence as it relates to knowledge in the context of D.C. Code § 22-3214.01. We do so here.

"[U]nless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense." *Dixon v. United States*, 548 U.S. 1, 5 (2006) (quoting *Bryan v. United States*, 524 U.S. 184, 193 (1998)); *see also Bryan*, *supra*, 524 U.S. at 192 ("[T]he term 'knowingly' does not necessarily have any reference to a culpable state of mind or to knowledge of the law."). The facts that constitute the offense of deceptive labeling under D.C. Code § 22-3214.01 are the act of distributing or possessing for distribution (by means of sale, resale, etc.) and the actual defects in the labeling, *i.e.*, the failure to "clearly and conspicuously disclose the true name and address of the manufacturer." Thus, we read the "knowing" requirement to apply to both. In *Jackson v. United States*, 856 A.2d 1111 (D.C. 2004), we commented about knowledge in the context of the statute under which the appellant was convicted, D.C. Code § 22-3814.1 (1996) (recodified at D.C. Code 22-3214.01 (2012 Repl.)).[5] We stated that "to secure a conviction for deceptive labeling, the government was required to prove the appellant knew that the label, cover, or jacket of the CDs in question did not clearly and conspicuously disclose

---

[5] In *Jackson*, we held "that other crimes or bad acts evidence may be offered for the purpose of demonstrating 'knowledge.'" 856 A.2d at 1116-17.

the true name and address of the manufacturer thereof. Such knowledge would be implicit if appellant knew the CDs were counterfeit." *Id.* at 1116 (finding knowledge of deceptive labeling, *inter alia*, based on prior bad acts and previous warnings regarding sale of counterfeit merchandise) (emphasis added) (internal alterations and quotation marks omitted).

Upon examination of the record, we hold that it contains ample evidence from which the jury could reasonably infer that appellant knowingly offered audio recordings and audiovisual work that did not clearly and conspicuously disclose the true name of the manufacturer. We consider, *inter alia*, the following facts: (1) appellant admitted he worked at American Shottas as the manager for more than two years; (2) he admitted he was responsible for ordering CDs and assisting customers in purchasing CDs and DVDs; (3) he had regular access to the office, which included disc burning towers, and the basement, where law enforcement discovered a significant number of burned CDs and DVDs that were apparently awaiting on-site packaging into slim-line jewel cases; (4) he admitted to making mix tapes from illegally downloaded music.

The judge's instructions regarding knowledge and circumstantial evidence provided appropriate guidance for considering whether appellant knowingly engaged in the offense of deceptive labeling as prohibited by D.C. Code § 22-

3214.01.  The government offered evidence that of approximately 16,000 compact discs in the store, only about 100 were legitimately labeled.  It strains credulity to suggest the man who managed the store and operated a disc-making machine in the store was not aware that the store contained a massive number—well over 1,000, as charged in Count 1 of the indictment—of illegally labeled, covered, or jacketed sound recordings.  The same holds true with respect to his knowledge of over 100 illegally labeled, covered, or jacketed audiovisual works.

## III.

Because the trial court instructed the jury properly on the law and the jury's findings are supported by the evidence, the judgment of the trial court is hereby

*Affirmed.*